COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| IN THE MATTER OF | § | No. 08-24-00077-CV |
| F.M.V., | § | Appeal from the |
| A JUVENILE. | § | 65th District Court |
| | § | Of El Paso County, Texas |
| | § | (TC# 2100093) |
| | § | |

**O P I N I O N**

F.M.V., a juvenile, appeals from an order adjudging him delinquent of five counts of "deadly conduct discharge firearm" and committing him to the Texas Juvenile Justice Department. He contends the trial court erred in denying his motion to suppress a statement he made during custodial interrogation. The appeal turns on whether the State complied with § 51.095 (1)(B)(i) of the Family Code[1] in obtaining the statement. Based on the record before us, we conclude that the

---

[1] Section 51.095 (1)(B)(i) expressly requires the juvenile's written statement to be "signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer if a bailiff is not available to be present if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that the bailiff or law enforcement officer may not carry a weapon in the presence of the child." Tex. Fam. Code Ann. § 51.095 (1)(B)(i).

trial court erred in denying the motion to suppress based on the State's failure to comply with the Code. Because we find that the error in admitting the statement at trial was harmful, we reverse the trial court's judgment and remand for a new trial.

## I. FACTUAL BACKGROUND

### A. The police investigate a shooting in Canutillo, Texas

At F.M.V.'s trial, Leonardo Ramirez Torres (Leonardo) and his wife, Maria De Los Angeles Ramirez (Maria), testified that in the late afternoon of November 22, 2022, multiple shots were fired at their home in Canutillo while they were inside. The home was damaged and Leonardo was hit in the eye, causing permanent damage.

A deputy from the El Paso County Sheriff's Office arrived on the scene that same day and observed bullet casings outside the home as well as bullet holes in a BMW parked adjacent to the home. She observed damage to the residence as well as Leonardo's eye injury. A crime scene investigator arrived shortly thereafter and described the house as "riddled with gunshot fire" with over 30 casings of different calibers in the front of the residence. Some of the casings appeared to be from a rifle, while others appeared to be from a .45 caliber handgun. Detective Carlos Bastardo was also called to the scene and obtained surveillance footage from a nearby home showing a white Dodge Charger passing by the residence at the time of the shooting.[2]

Leo, the Ramirezes' son, testified that he was not home at the time of the shooting but returned home shortly after his parents' friend called him about the incident. Leo told the deputies he suspected the shooting may have been prompted by an altercation at a nearby outlet mall with

---

[2] Maria also testified that she observed a white car driving away from the scene after the shooting stopped.

a group of individuals that included F.M.V. and another juvenile (J.O.).[3] According to Leo, he was with a group of friends when J.O. instigated a fight with him. Leo recalled punching J.O. in the face and F.M.V. attempting to punch him in the arm but "missed" and only "grazed" him. Leo testified that he pushed F.M.V. but did not punch him, given their past friendship. According to Leo, F.M.V. did not threaten him, but J.O. was being "threatening" and warned him, "wait here you're going to see what's going happen to you." Not wishing to continue the encounter, Leo called his mother to pick him up.

Maria testified at trial that when she arrived at the mall, she observed a fight between her son and J.O., but F.M.V. was not involved. She recalled hearing J.O. threatening Leo, saying "I know where you live" and "he was going to go fuck [Leo] up."

Because the shooting occurred 30 minutes to two hours after the encounter at the outlet mall, the police identified F.M.V. and J.O. as suspects. That same evening, Bastardo unsuccessfully attempted to make contact with both of them at their families' homes. The next day, he spoke with J.O.'s brother, who informed him that an individual named "Andre" drove a white Dodge Charger. A DPS trooper initiated a traffic stop of the Dodge Charger that day and observed Andre in the back seat along with a .45 caliber handgun. Andre was not arrested at that time, but the sheriff's office placed his apartment under surveillance. While waiting to obtain a search warrant, they observed Andre leaving the apartment with two or three other individuals carrying a large trash bag. Shortly thereafter, another deputy pulled the car over a second time and observed Andre in the back seat along with the trash bag. A search of the bag revealed an AR15

---

[3] Leo explained that he was acquainted with J.O. and that although he and F.M.V. had previously been "good friends," their relationship had changed recently and they no longer spoke.

rifle that had been broken in half, with .223 caliber bullets in the magazine matching the description of some of the casings found at the Ramirez home. Andre had two magazines sticking out of his sweater or hoodie pocket. His apartment was searched, and the deputies found a .45 caliber handgun matching the bullet casings at the Ramirez home. Andre was arrested on a charge of aggravated assault with a deadly weapon.

As part of his investigation, Bastardo spoke with a juvenile (A.S.) whom they believed was F.M.V.'s girlfriend after being informed that F.M.V. had sent texts and a video of the incident to her Instagram account. At trial, Bastardo testified that although the video was no longer available, A.S. described it to him when they met. However, when the State asked him to relate A.S.'s description of the video to the jury, defense counsel objected on hearsay grounds and the State withdrew the question.

A.S. was called as a witness at trial and initially testified that she did not recall receiving a video from F.M.V. However, A.S. later acknowledged receiving a video but claimed not to remember what it depicted. She testified that she did not recall telling the detectives about it. A.S. averred that she had no recollection of F.M.V. giving her any information about the shooting. The State then introduced a series of text messages between A.S. and F.M.V., which had been downloaded from her phone pursuant to a search warrant. In the text messages, A.S. stated that everyone at school was "talking about the shooting," and F.M.V. responded, "whenever ur free n I'm over ill lyk so we can link n tell *ya* everything in detail." F.M.V. also told her Andre had been arrested for aggravated assault with a deadly weapon, and he did not know if he would "snitch." In the texts, F.M.V. repeatedly told A.S. he did not want her to get "involved" and to "stay safe." He cautioned her to tell law enforcement they had not spoken recently.

4

**B. F.M.V. is taken into custody and provides a written statement**

F.M.V.'s mother, whom we identify as I.V.,[4] testified at trial that F.M.V., who was 14 years old at the time, had left home on or about November 12, 2022, and that she reported him as a runaway on November 19. When F.M.V. returned home on November 28, 2023, she recalled contacting the sheriff's department to "end the runaway report" and was informed that they needed to speak with F.M.V. about the shooting. I.V. testified that Bastardo came to their residence to speak to F.M.V. the same day, but F.M.V. denied knowing anything about the shooting and denied knowing Andre. Bastardo also testified that F.M.V. denied any knowledge of the shooting but recalled that F.M.V. informed him of the altercation at the outlet mall, claiming he went with J.O. after the altercation to stay with J.O.'s grandmother at her house in El Paso.

As discussed in more detail below, I.V. testified that F.M.V. had mental health issues and had a manic episode a day or two after his initial meeting with Bastardo, telling her that he was "mad" and wanted to "kill him."[5] She contacted Bastardo for help as she was "scared" and because she "assumed" from what F.M.V. was saying that he might have had something to do with the shooting.

**C. F.M.V. is detained and provides a written statement**

Bastardo testified that when he spoke with F.M.V.'s mother, she told him F.M.V. had given her "information" she wished to share. Based on that information, he and his partner (Detective Cesar Paredes) went to F.M.V.'s residence on December 1, 2022, to take F.M.V into custody and

---

[4] The Texas Family Code provides that "[n]either the child nor his family shall be identified in an appellate opinion." Tex. Fam. Code Ann. § 56.01(j).

[5] It is unclear from the record to whom F.M.V. was referring.

5

transport him to a juvenile processing center in Vinton, Texas (the Center).[6] According to Bastardo, F.M.V. was "calm" and "cooperative" at the time.

After warning F.M.V. of his rights and taking him to meet with a magistrate judge who reiterated his rights, F.M.V. provided Bastardo with a written statement.[7] F.M.V.'s statement reported that after the incident at the outlet mall, J.O. called his friend, Andre, who picked them up in a white Dodge Charger with another juvenile named Jonathan, both of whom were wearing black masks. According to the statement, Jonathan had a .45 caliber handgun and Andre had an AR rifle next to him. Andre asked F.M.V. for Leo's address, and although F.M.V. did not know the address, he agreed to show Andre where the house was. After pointing out the house, Andre and Jonathan got out of the car and began shooting. According to F.M.V., Andre shot first and "sprayed the house to include the windows," and Jonathan shot twice into a white BMW nearby.

F.M.V. stated that he and J.O stayed in the backseat of the car and admitted to recording the shooting on J.O.'s phone. After leaving the scene, the four went to Andre's house and remained there overnight. The next day, Andre informed them that they needed to leave as he believed the police were coming. F.M.V. reported that he then went to J.O.'s grandmother's house, and at some point, he sent the video of the shooting to his "girlfriend, [A.S.]." He reported that after he heard about Andre's arrest, J.O. "started panicking and started clearing his phone." F.M.V. later called

---

[6] As discussed in more detail below, the Texas Family Code provides, with limited exceptions, that a juvenile must be taken to a "juvenile processing office" designated under § 52.025 of the Code for purposes of obtaining a statement from the juvenile. Tex. Fam. Code Ann. §§ 52.02; 52.025. There is no dispute that the Center was a designated processing office within the meaning of the Code.

[7] The statement itself was prefaced with a document entitled, "Voluntary Statement of Child," in which F.M.V. stated that he had been advised of his rights by both the magistrate and Bastardo, i.e., "I fully understand each of these rights, including my right to consult with an attorney prior to and during the making of this statement, and I freely and voluntarily waive my right to consult with an attorney prior to the making of this statement and my right to remain silent."

6

his mother to pick him up, and his mother contacted Bastardo to let him know that F.M.V. was a "returned runway," which led to him speaking with the detective.

## II. PROCEDURAL BACKGROUND

On December 14, 2022, the State filed a determinant sentence petition against F.M.V. listing five counts of "delinquent conduct," each alleging that on November 22, 2022, he "knowingly discharge[d] a firearm at and in the direction of a habitation and was reckless as to whether the habitation was occupied . . . [and] use[d] and exhibit[ed] a deadly weapon, to wit: a firearm, during the commission of [the] offense."

### A. F.M.V. moves to suppress his written statement

Prior to trial, F.M.V. moved to suppress the written statement he gave Bastardo on the grounds that (1) it was not made knowingly, voluntarily, and intelligently given F.M.V.'s mental health issues, and (2) the State did not follow the proper procedures under Texas Family Code § 51.095 as required before a juvenile's statement may be admitted at trial. The trial court held a hearing at which Bastardo, a jail magistrate, and I.V. testified. The trial court denied F.M.V.'s request to allow his expert witness to testify regarding his mental health issues.

### B. The motion-to-suppress hearing

#### (1) Evidence regarding F.M.V.'s initial detention

F.M.V.'s initial detention that day was recorded on Bastardo's bodycam, which was introduced in evidence at the hearing, as well as at F.M.V.'s trial. On the video, F.M.V. is being handcuffed outside his residence and escorted to the street to wait for a patrol car to take him to the Center. I.V. acknowledged at the hearing that although F.M.V. suffered from mental health issues and what she believed was an ongoing manic episode beginning the day before his arrest,

he appeared "pretty calm" on the video.[8] On the video, F.M.V. asked Bastardo and Parades whether he would be detained until his next court date and whether consensual fighting was legal in Texas. He also laughed at Bastardo's joke that handcuffs were not meant for "comfort," expressed that he is always "cooperative with cops," and told the detectives they could have spoken with him without arresting him. In response, Bastardo repeatedly informed F.M.V. that if he wished to speak with them, he would first need to meet with a magistrate judge to inform him of his rights.

Bastardo testified that after they transported F.M.V. to the Center, he indicated that he wished to provide a statement. Bastardo therefore read F.M.V. his rights from a standard waiver form used in juvenile cases, which included F.M.V.'s rights under *Miranda*, the Texas Code of Criminal Procedure, and the Texas Family Code.[9] The bodycam video of the detective reading F.M.V. his rights was played at the hearing and at trial. As reflected in the video, Bastardo testified that after he read F.M.V. his rights and asked F.M.V. if he understood what he had read to him, F.M.V. responded, "kind of."

---

[8] At the hearing, I.V. testified that F.M.V. had been diagnosed with "bipolar disorder, major depressive disorder [and] ADHD." Although she did not know his reading level, she acknowledged that he "understands and reads and writes English," even though I.V. primarily spoke Spanish in the home. She further testified that when F.M.V. was nine years old, he had been involved in a bike accident that caused a traumatic brain injury, after which he began having seizures and manic episodes. I.V. observed that when F.M.V. is in a manic state, he doesn't sleep, "he can't stay still," and he becomes "aggressive." According to I.V., the day before F.M.V. was arrested, he was having a manic episode, was not "making sense," and was "homicidal."

[9] The rights set forth in the form included the right to remain silent and a warning that any statement made would be used in evidence against him; the right to an attorney, including the right to an appointed attorney in the case of indigency; the right to terminate the interview at any time; a warning that a juvenile 14 years or older could be tried as an adult for certain specified offenses not at issue herein; and a lengthy explanation of certain sentencing guidelines in the event the juvenile was found to be an habitual offender. The form concluded with the following: "All the rights that have been explained to you are continuing rights which can be used by you at any time." The form was signed and dated by F.M.V., whose signature was witnessed by Bastardo.

Parades, who was also in the interview room, then asked F.M.V. if he still wished to make a statement to tell them "what happened." After F.M.V. responded in the affirmative, Bastardo informed F.M.V. that he would be taken to meet with a magistrate judge who would explain his rights to him in more detail. Before leaving for the meeting, F.M.V. signed and dated the waiver form Bastardo had read to him, and Bastardo signed as a witness. Bastardo testified at the hearing that F.M.V. appeared to understand the procedure.

### (2) Evidence regarding F.M.V.'s first interview with a magistrate

Bastardo testified that he took F.M.V. to meet with Judge Sarah Priddy, a jail magistrate in downtown El Paso, to read F.M.V. his rights. According to Bastardo, Judge Priddy's office was in the adult jail facility. Bastardo believed that because F.M.V. was a juvenile, he could not be taken into the facility due to the risk of psychological or physical harm by exposure to adult offenders.[10] Judge Priddy confirmed at the hearing that she also believed she was prohibited from taking juveniles into the jail facility due to concerns that a juvenile could be coerced if exposed to adult offenders. She noted that although there are private offices and courtrooms inside the facility, it does not have a designated juvenile processing office. Therefore, she met with F.M.V. on the street outside the jail to conduct the interview.

Judge Priddy did not recall their exact discussion. But she explained that her typical procedure is to go over the juvenile's rights and ask questions to make sure that they understand their rights, "just like a quiz, like a teacher would do." Judge Priddy stated that she makes sure the juvenile understands his right to terminate the interview and asks the juvenile questions to ensure

---

[10] Bastardo acknowledged that the streets outside the facility are busy, with "cars whizzing by" and "[o]ther adults including law enforcement officers, pass[ing] by all the time."

he understands that he can stop the interview at any time. Judge Priddy testified that F.M.V. did not have "any trouble communicating with [her] in English," and she had no reason to believe F.M.V. did not understand his rights. However, she did not recall asking F.M.V. his age or whether he had any mental health issues or learning disabilities.

### (3) Evidence regarding F.M.V.'s second meeting with the magistrate

After the meeting with Judge Priddy, Bastardo transported F.M.V. back to the Center, where he ascertained that F.M.V. still wanted to provide a statement. He typed the statement as F.M.V. verbally relayed it to him. Bastardo then allowed F.M.V. to read the statement, and after F.M.V. "approved" it, Bastardo had him sign it.[11]

Bastardo and Paredes, along with a patrol officer, transported F.M.V. back to downtown El Paso to meet with Judge Priddy so F.M.V. could sign the statement in her presence. This encounter also took place on the street at the entrance of the jail facility and was captured on the detectives' bodycams in two separate recordings. Both Bastardo and Judge Priddy testified that during Judge Priddy's second meeting with F.M.V., the officers who brought him were positioned on the street in F.M.V.'s sight but were far enough away that they could not overhear the conversation.

Both bodycam videos were played at the hearing. The first video, from Paredes's bodycam, started at 15:18:16 on December 1, 2022, and shows Bastardo standing at the entrance to the jail facility providing Judge Priddy F.M.V.'s written statement. Shortly thereafter, the patrol officer,

---

[11] We note that although the correct protocol is to have the statement signed in the presence of the magistrate rather than in the presence of law enforcement, courts have recognized that any error in having the juvenile sign prematurely is "made irrelevant" or "cured" when the magistrate reviews the statement with the juvenile and has him re-sign it. *See, e.g.*, *In re J.M.S.*, No. 06-04-00008-CV, 2004 WL 1968644, at *2 (Tex. App.—Texarkana Sept. 8, 2004, no pet.) (mem. op., not designated for publication).

who is visibly armed, escorts F.M.V. to where Judge Priddy and Bastardo are standing and removes F.M.V.'s handcuffs. Bastardo then walks to one corner of the street, at a distance he estimated was approximately 30 feet away from Judge Priddy and F.M.V. At the same time, the patrol officer walks in the opposite direction to stand next to the patrol car with Parades, who is also visibly armed, at about the same distance from Judge Priddy and F.M.V. The video depicts a row of marked police cars along the street. At one point, a police officer who was not involved in F.M.V.'s case, but is also visibly armed, is seen taking something from the trunk of his patrol car and walking right past Judge Priddy and F.M.V. into the jail facility followed by a female in plain clothes.

Approximately two minutes into the video, Judge Priddy calls out to the detectives in a raised voice to ask them what time they read F.M.V. his rights. Bastardo then walks past Priddy and F.M.V. to speak with Paredes, and after apparently finding the paperwork with the time on it, walks back to where Judge Priddy and F.M.V. are standing to hand her the paperwork.

For unknown reasons, Paredes's bodycam recording stops at this point, at 15:22:34, and Bastardo's bodycam recording begins less than two minutes later, at 15:24:09. At the start of this video recording, both detectives are standing near the patrol car along with the patrol officer. Judge Priddy calls them over at approximately 15:25:30 to inform them of a correction to the statement, and she directed F.M.V. to sign the corrected statement. After acknowledging the correction, Judge Priddy and Bastardo both sign the statement.

At the suppression hearing, Judge Priddy testified that in accordance with her standard procedure, during this encounter, she read F.M.V.'s statement silently to herself and believed F.M.V. read the statement to himself at the same time. She then asked F.M.V. if the statement

11

reflected what he had told the detectives or if any part was incorrect. In response, F.M.V. denied telling the detectives that he had sent a video of the shooting to his girlfriend, so Priddy had him scratch that sentence out and initial it. After F.M.V. told Judge Priddy that everything else in the statement was correct, she had him sign the statement in her presence. Judge Priddy recalled what was reflected in the video footage: after she finished reviewing the statement with F.M.V., Judge Priddy waved over the detectives to explain to them that F.M.V. had scratched out the line in the statement. Judge Priddy then signed the statement and had Bastardo sign it as a witness.[12]

Judge Priddy testified at the hearing that during both of her interactions with F.M.V., she had no reason to believe that he did not "understand what was happening." She further testified that she had no fear of F.M.V. during their encounters and that she would not have required a bailiff to be present if she had met alone with him in a courtroom or office.

### (4) The trial court's order denying the motion

Following the hearing, the trial court denied F.M.V.'s motion to suppress his written statement and entered findings of fact and conclusions of law. In concluding that F.M.V. provided his statement voluntarily and knowingly and "understood the nature and context of his statement," the court considered his "age, appearance on video, ability to read and answer questions." The court found no evidence that F.M.V. "was coerced or unduly influenced to provide his statement."

The trial court also concluded that the statement was obtained in compliance with the Texas

---

[12] Judge Priddy also signed a document entitled, "Magistrate's Certification of Juvenile's Competency to Make Statement," stating that F.M.V. had appeared before her "for the purpose of signing in [her] presence [his statement] with no law enforcement or prosecuting attorney present." In the certification, Judge Priddy attested that she had "examined [F.M.V.] independent of any law enforcement officer or prosecuting attorney, and . . . determined that [he] understands the nature and contents of his/ her statement and has knowingly, intelligently and voluntarily waived the rights specified in part one of this document." Finally, she attested that she was "fully convinced that [F.M.V.] understands the nature and contents of his/her statement and has signed every page of this statement voluntarily."

Family Code, finding that "[l]aw enforcement was not present during the examination and signing of [F.M.V.'s] statement"; the magistrate examined F.M.V. "independent from law enforcement"; "[t]he magistrate was fully convinced that [he] understood the nature and content of the statement[;] and that [he] knowingly, intelligently, and voluntarily waived his rights." Finally, the trial court found that "[t]he jail magistrate does not have a Juvenile Processing Center" where a juvenile interview could take place.

### C. F.M.V. raises the issue of the voluntariness of his confession at trial

At trial, F.M.V. again raised the issue of whether his statement was made voluntarily and/or in compliance with the Texas Family Code. Relevant to that issue, F.M.V.'s mother, I.V., again testified about F.M.V.'s mental health issues and her belief that F.M.V. was having a manic episode at the time of his arrest. F.M.V. also presented the testimony of James Schutte, a licensed psychologist, who testified that he had evaluated F.M.V. and determined, based on testing, that his I.Q. was 84, which he explained was significantly below average and indicated a "diagnosis of borderline intellectual functioning." Schutte further determined that F.M.V. was reading at a fifth-grade level. Schutte opined that F.M.V. would not have been able to understand his rights by reading the waiver form, which was written at a twelfth-grade level, nor would he have been able to fully understand them as read to him, as reflected by his statement to Bastardo that he "kind of" understood them.

Schutte testified that he had viewed the videos of the magistrate's meeting with F.M.V. on the street outside the jail facility and found it "problematic" to conduct a meeting of this nature on the street, noting it was a busy street with a high level of noise, including passing sirens. Schutte opined that, particularly given F.M.V.'s "cognition level," he may not have understood the

13

importance of waiving his rights and may have felt "pressure" to waive his rights in a hastened manner without fully understanding the significance of doing so.[13] Based on these factors, Schutte expressed his belief that F.M.V. did not knowingly and intelligently waive his rights prior to signing his statement.

At defense counsel's request, in its charge, the trial court instructed the jurors that they could not consider F.M.V.'s statement unless they determined that "the State [proved] beyond a reasonable doubt that the juvenile's written statement was voluntary."[14] F.M.V.'s attorney also sought an instruction that would have allowed the jury to disregard F.M.V.'s statement if the jury concluded that the statement was not taken in compliance with the Family Code. The State opposed the request, reasoning that the question of whether the statement was taken in compliance with the Family Code was a question of law to be resolved by the court, not a fact question to be resolved by the jury. Defense counsel countered that he believed a fact issue existed that the jury could resolve regarding whether the statement was taken in the "presence" of law enforcement and whether the officers present were armed. The trial court denied the instruction.

### D.  The jury charge and the parties' theories of the case

In its charge, the court instructed the jurors on the elements of the offense of deadly conduct as to all five counts alleged in the petition. It instructed them that if they found "from the evidence beyond a reasonable doubt that on or about the 22nd day of November, 2022 [F.M.V.] knowingly

---

[13] Schutte also testified at trial, without elaboration, that F.M.V. had informed him that he felt "tricked" into giving his statement.

[14] The full text of the instruction as submitted by defense counsel read: "If the state has not proven to you beyond a reasonable doubt that the juvenile's written statement was voluntary, you are not to consider it for any purpose, nor any evidence obtained as a result thereof. However, if the state has proven to you beyond a reasonable doubt that the juvenile's written statement was voluntary, it is to be considered in your deliberations."

14

discharge[d] a firearm at and in the direction of a habitation and was reckless as to whether the habitation was occupied," they will find him delinquent of "Deadly Conduct Discharge Firearm."[15] The trial court also instructed the jurors that if they found F.M.V. not delinquent of the charges as alleged, they could find him delinquent of the lesser-included offense of deadly conduct as to each count if they found that he "recklessly engage[d] in conduct that placed another in imminent danger of serious bodily injury."[16]

In addition, the trial court instructed the jury on the "law of the parties," providing:

A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense or if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are delinquent of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.[17]

In closing, the prosecutor acknowledged there was no evidence in the record that F.M.V. was the shooter. However, she argued there was sufficient evidence from which the jury could find

---

[15] Section 22.05(b) of the Penal Code provides: "A person commits an offense if he knowingly discharges a firearm at or in the direction of: (1) one or more individuals; or (2) a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied." *Id.* 22.05(b). An offense under subsection (b) is a felony of the third degree. Tex. Pen. Code Ann. § 22.05(e).

[16] Section 22.05(a) of the Penal Code, labeled "Deadly Conduct," provides: "A person commits an offense if he recklessly engages in conduct that places another in imminent danger of serious bodily injury." *Id.* 22.05(a). An offense under that subjection is a Class A misdemeanor. *Id.* 22.05(e).

[17] Tex. Penal Code Ann. § 7.01 (a); *see also Welchman v. State*, No. 08-02-00193-CR, 2003 WL 22413638, at *6 (Tex. App.—El Paso Oct. 23, 2003, no pet.) (mem. op., not designated for publication) (citing Tex. Pen. Code Ann. § 7.01(a)(2)). To establish this theory of liability, the State must prove the illegal conduct of the primary actor and that the accused acted with the intent to promote or assist the commission of the offense. *Id.* (citing *Stroman v. State*, 69 S.W.3d 325, 329 (Tex. App.—Texarkana 2002, pet. ref'd)). In determining whether a defendant is a party to an offense, the court may examine the events occurring before, during, or after the offense is committed and may rely on the defendant's actions showing an understanding and common design to commit the offense. *Id.* (citing *Marable v. State*, 85 S.W.3d 287, 293 (Tex. Crim. App. 2002)).

15

F.M.V. delinquent of the alleged charges based on the doctrine of law of the parties. In support, the prosecutor emphasized that F.M.V.'s statement—which she argued was voluntary and therefore could be considered by the jury in determining F.M.V.'s role in the shooting—provided clear evidence that F.M.V. intentionally aided and abetted the shooting by directing the driver to Leo's home.

Defense counsel, however, maintained that the jury should not consider F.M.V.'s statement in its deliberations, as it was not voluntarily made and/or was not made in compliance with the Family Code. Defense counsel further argued that, even considering the statement, there was no evidence that F.M.V. instigated the shooting or that he intentionally aided and abetted in the offense. He contended that Andre, who was several years older, had essentially compelled F.M.V. to get into the vehicle and direct him to Leo's house. Counsel concluded by urging the jury to find F.M.V. not delinquent with respect to all five charged offenses, or in the alternative, find F.M.V. only delinquent of the lesser-included offenses of deadly conduct.

### E. The jury's verdict and the trial court's order of commitment

The jury found F.M.V. delinquent of "Deadly Conduct Discharge Firearm" on all five counts. In its Order of Commitment, the trial court found F.M.V. "in need of rehabilitation and or the protection of the public or [F.M.V.] requires that a disposition be made." It found that the appropriate disposition was a three-year "determinate commitment to the Texas Juvenile Justice Department." This appeal ensued.

## III. ISSUES ON APPEAL

On appeal, F.M.V. first contends the trial court abused its discretion by denying the motion to suppress his written statement on the grounds that (1) the statement was not made voluntarily

16

and knowingly, and (2) it was not made in compliance with the Texas Family Code. Second, he argues the trial court erred by not providing the jury with an instruction allowing it to determine whether F.M.V.'s statement was admissible under the Texas Family Code. Third, F.M.V. maintains the trial court abused its discretion by refusing to allow his expert witness to testify at the suppression hearing. Because we find that the statement was not made in compliance with the Texas Family Code and conclude that the trial court erred in admitting the statement at trial, we address only this issue as it is dispositive of the appeal.[18]

## IV. THE TRIAL COURT'S DENIAL OF THE MOTION TO SUPPRESS

### A. Standard of review

When reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *Ochoa v. State*, 707 S.W.3d 344, 360 (Tex. Crim. App. 2024) (citing *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019)). "We defer almost totally to a trial court's determinations of historical fact, so long as such determinations are supported by the record, as well as to its rulings on mixed questions of law and fact that hinge on credibility and demeanor." *Id*. However, we "review *de novo* the trial court's rulings on pure questions of law or mixed questions of law and fact that do not hinge on credibility or demeanor." *Id.* (citing *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023)). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *Id.*

---

[18] *See Ochoa v. State*, 707 S.W.3d 344, 353 (Tex. Crim. App. 2024) (concluding that the court would only address the dispositive issue before it and was not required to address the other two issues raised by the defendant).

**B. Applicable law**

Because F.M.V. was a juvenile at the time of his arrest, the Texas Family Code governs the admissibility of his written statement. *See Roquemore v. State*, 60 S.W.3d 862, 866 (Tex. Crim. App. 2001) (en banc) (citing *Comer v. State*, 776 S.W.2d 191, 196 (Tex. Crim. App. 1989) (holding that issues involving the substantive rights of pre-transfer juveniles are governed by the Family Code)). Once a juvenile raises the issue of noncompliance with the Family Code's requirements in the trial court, the burden shifts to the State to demonstrate its compliance. *See In re J.B.J.*, 86 S.W.3d 810, 813 (Tex. App.—Beaumont 2002, no pet.) (citing *Hill v. State*, 78 S.W.3d 374, 382–83 (Tex. App.—Tyler 2001, pet. ref'd); *In re C.R.*, 995 S.W.2d 778, 783 (Tex. App.—Austin 1999, pet. denied)). Here, F.M.V. raised the issue of whether the State complied with Texas Family Code § 51.095, and therefore, the issue before us is whether the State met its burden of demonstrating its compliance with that provision.

Section 51.095 requires a two-step process before a juvenile's written statement may be admitted in evidence. The first step is to ensure that the juvenile received his warnings from a magistrate prior to making the statement. Tex. Fam. Code Ann. § 51.095(1). The Code provides no requirement that this first step must be done outside the presence of law enforcement; thus, the Texas Criminal Court of Appeals has held that the magistrate may read the warnings to a juvenile with law enforcement present. *See Herring v. State*, 395 S.W.3d 161 (Tex. Crim. App. 2013) (recognizing that although the second step may not take place in the presence of law enforcement, "by omitting such a prohibition in Subsection 51.095 (a)(1)(A), the legislature expressed an intent that such a prohibition should not apply to the reading of the statutory warning"). In contrast, the second step expressly requires that the juvenile's written statement be "signed in the presence of a

18

magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that the bailiff or law enforcement officer may not carry a weapon in the presence of the child."[19] Tex. Fam. Code Ann. § 51.095 (1)(B)(i).

As our sister court has recognized, these provisions of the Family Code are designed "to ensure that children are fully informed and not influenced into waiving their rights" when being subjected to custodial investigations. *See Matter of B.B.*, 567 S.W.3d 786, 790 (Tex. App.—San Antonio 2018, no. pet). In other words, the Family Code procedures provide a "protective check" on law enforcement to ensure that a juvenile is not unduly influenced by law enforcement and the juvenile's statement is given voluntarily. *Id.* As the Court of Criminal Appeals has observed, in juvenile cases, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Ochoa*, 707 S.W.3d at 362.

For this reason, "[p]olice officers, courts, and others involved in handling juveniles 'are bound to comply with the detailed and explicit procedures' enacted by the Texas legislature and set out in the Family Code." *Contreras v. State*, 67 S.W.3d 181, 184 (Tex. Crim. App. 2001).[20] The Court of Criminal Appeals has therefore "established a policy of strict compliance with the Family Code provisions" in juvenile prosecutions and has recognized that a statement made by a juvenile

---

[19] The Code provides further requirements, which we do not address here.

[20] *See also Matter of B.B.*, 567 S.W.3d at 790 (recognizing same) (citing *In re R.R.*, 931 S.W.2d 11, 14 (Tex. App.—Corpus Christi 1996, no writ); *In re D. M. G. H.*, 553 S.W.2d 827, 828 (Tex. Civ. App.—El Paso 1977, no writ)).

is inadmissible if the Family Code requirements were not followed. *See Roquemore*, 60 S.W.3d at 868 (citing *Comer*, 776 S.W.2d at 195–96) (holding a juvenile's statement inadmissible for violations of the Family Code).[21] Accordingly, evidence obtained in violation of the applicable Family Code provisions must be suppressed. *Comer*, 776 S.W.2d at 196 (holding that juvenile's statement was inadmissible due to the failure to follow Family Code § 52.02(a)); *Jeffley v. State*, 38 S.W.3d 847, 858 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (holding that a statement obtained in violation of Family Code § 51.095 was inadmissible at trial).[22]

## C. Analysis

F.M.V. maintains the State did not meet its burden of establishing that the requirements of Family Code § 51.095 were met, as the record reflects that when he signed his statement during his meeting with the magistrate, law enforcement officers were present, some of whom were armed, without any showing that their presence was necessary for the magistrate's personal safety. We agree.

In reaching this conclusion, we first note, as the parties do, that the Code does not define the term "present." And the parties have not cited any cases examining the Legislature's intent in using the term "present" in the Code, nor have we found any. We must therefore construe the meaning of the term, and we do so as "a pure question of law." *State v. Torres*, 666 S.W.3d 735, 741 (Tex. Crim. App. 2023) (recognizing that "[s]tatutory construction is a pure question of law")

---

[21] *See also Ray v. State*, 176 S.W.3d 544, 548 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("[T]he Court of Criminal Appeals has repeatedly recognized the necessity of strict compliance with the Family Code provisions governing the handling of juvenile defendants.").

[22] *See also In re D.J.C.*, 312 S.W.3d 704, 720–21 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (recognizing that "any statement of a juvenile taken in violation of the provisions of the Family Code governing the substantial rights of a juvenile in custody is inadmissible at trial" and ruling that a juvenile's statement was therefore inadmissible at trial due to violations of Family Code §§ 52.02(a); 52.025(a), (b)(5), and (c); and 51.095(a)(1)(A) and (a)(5)).

20

(citing *Ramos v. State*, 303 S.W.3d 302, 306 (Tex. Crim. App. 2009)).

The State appears to be advocating that we construe the term "present" as used in the Code to only include situations in which law enforcement officers were close enough to overhear the magistrate's conversation with the juvenile. According to the State, the Family Code's requirement that the juvenile's meeting with the magistrate take place outside the presence of law enforcement is "to ensure that a juvenile has a neutral examination by the magistrate," and that the juvenile is "not unduly influenced by law enforcement."[23] In turn, the State maintains this purpose is fulfilled by ensuring that law enforcement officers are not "a party to the conversation or examination between a juvenile and a magistrate." And the State points out that the conversation between F.M.V. and Judge Priddy was "private" in that sense, and that the purposes of the Family Code were thereby fulfilled.

F.M.V., on the other hand, contends the Legislature's use of the term "present" contemplates that—at least in situations in which there the magistrate does not have a fear for her personal safety—law enforcement officers may not be in "sight of" or in visual range of a juvenile when the magistrate is reviewing his statement.

---

[23] In support, the State relies on *Matter of B.B.*, but we do not find it helpful to the State's position. In that case, our sister court was faced with a situation in which the trial court went beyond reading a juvenile his rights, and instead began questioning the juvenile based on a list of questions provided by the arresting officer. 567 S.W.3d 786, 788–89 (Tex. App.—San Antonio 2018, no. pet). The court recognized that the provisions of the Family Code illustrate that "the Texas Legislature contemplated the magistrate would remain neutral and provide a protective check on the questioning of a juvenile in order to ensure the voluntariness of a juvenile's statement." *Id.* at 790 (citing *Missouri v. McNeely*, 569 U.S. 141, 155 (2013) (noting "neutral magistrate judge's essential role as a check on police discretion")). And the court held that "a magistrate cannot be asked to remain neutral and impartial when engaged in investigative questioning." *Id.* at 791. In turn, the court held that the magistrate's questioning violated § 51.095, first, because the Code "only provides for questioning by peace officers or attorneys representing the state" (and only after the juvenile is warned of his rights), and second, the magistrate failed to maintain the requisite neutrality required by the statute. *Id.* at 790–91. We find nothing in *B.B.* that would support a finding that the Family Code's requirements of not having law enforcement present while reviewing a juvenile's statement would be fulfilled simply by ensuring that the meeting does not take place within hearing range of law enforcement.

In determining the plain meaning of a statutory term that is not defined and has not acquired a "technical meaning to which we must defer," we may look to standard dictionary definitions. *Torres*, 666 S.W.3d at 742 (citing *Ramos*, 303 S.W.3d at 307). And in defining the term, we must not view it in isolation, but rather in the context of the entire Code provision at issue. *Id.* at 743 (citing Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012), at 167; *Smith v. United States*, 508 U.S. 223, 229 (1993) ("Language, of course, cannot be interpreted apart from context. The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it.")); *see also Thomas v. State*, 919 S.W.2d 427, 430 (Tex. Crim. App. 1996) (en banc) ("We always strive to give words and phrases meaning within the context of the larger provision."); *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim. App. 1999) (recognizing that "[t]he context of the entire organized crime statute gives clues to the meaning of undefined words"). "Interpreting words in context becomes even more critical when construing words with wide-ranging meanings." *Torres*, 666 S.W.3d at 743 (recognizing that the word "uses" poses difficulty in interpreting it because of the "different meanings attributable to it" and the "elastic" nature of the term itself).

The term "present" is defined by the Meriam-Webster Dictionary as "being in view or at hand." PRESENT Definition & Meaning - Merriam-Webster; *see also Smith v. State*, 200 S.W.3d 644, 648 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (where public lewdness statute did not define term "present," court looked to the dictionary definition of the term, as being "in view or at hand") (citing Webster's New Collegiate Dictionary 903 (1981)). In turn, Merriam-Webster provides synonyms for the term, "at hand," as follows: "not being distant in time, space, or

significance" and "being within the confines of a specified place." AT HAND Synonyms: 128 Similar and Opposite Words | Merriam-Webster Thesaurus. As well, the Cambridge Dictionary defines the term as being "in a particular place." PRESENT | English meaning–Cambridge Dictionary. The definition of the term "present" as being "in view" comports with a reading of § 51.095 as a whole and its purpose. *See Shipp v. State*, 331 S.W.3d 433, 437–38 (Tex. Crim. App. 2011) (recognizing that the meaning of a term in statute may be determined by "the context of the statute as a whole [and] by a consideration of its purpose").

As set forth above, § 51.095 does not allow law enforcement to be present when the magistrate has not expressed a fear for her personal safety, but does allow an *unarmed* bailiff or a law enforcement officer to be present when the magistrate expresses a safety concern for herself or court personnel. Tex. Fam. Code Ann. § 51.095 (1)(B)(i) (emphasis added). While a courtroom or other confined space in a courthouse is not the only place a magistrate is permitted to meet with a juvenile in this context, the Legislature's reference to a "bailiff" and "court personnel" intimates that the magistrate would likely meet with a potentially dangerous juvenile within a courthouse. We find it significant that the Legislature contemplated that the meeting could take place in a closed setting, such as a courtroom, which in turn, would suggest that it could be conducted within earshot of an unarmed bailiff or law enforcement officer. This tells us that the Legislature was not simply concerned with avoiding situations in which a law enforcement officer might overhear a conversation between a magistrate and a juvenile, but was instead concerned with creating a procedure that would ensure that a juvenile—even a potentially dangerous one—did not feel intimidated or coerced when waiving his rights and when providing a statement in response to custodial interrogation. *Matter of B.B.*, 567 S.W.3d at 790 (citing *Ramos v. State*, 961 S.W.2d 637,

23

639 (Tex. App.—San Antonio 1998, no pet.) (recognizing that "the obvious concern of the Family Code provision is to ensure that children are fully informed and not influenced into waiving their rights when they are being interviewed by officers")). In other words, the Legislature created the "detailed and explicit procedures" set forth in § 51.095 to place a "protective check" on law enforcement in juvenile cases and strike a balance between public safety concerns and the child's welfare. *See id.*; *see also Roquemore*, 60 S.W.3d at 872 (recognizing that the juvenile provisions in the Family Code "seek[] to strike a balance between the competing interests of public safety and child welfare"). We therefore conclude that in a case such as this where the magistrate has expressed no fear of the juvenile, the Legislature intended that the magistrate review the juvenile's statement outside the visual presence of law enforcement to avoid the juvenile being subjected to any feelings of intimidation or coercion from such presence.

The State, however, contends that any rule requiring law enforcement to be outside the visual range of the juvenile when meeting with a magistrate would be unworkable, pointing out that such a meeting is only required when the juvenile is "in custody" or is otherwise being detained by law enforcement. *See* Tex. Fam. Code Ann. § 51.095(d)(2) (providing that subsections (a)(1) and (a)(5) only apply to the statement of a child made "while the child is in the custody of an officer" or while the child is otherwise detained or in the possession of the Texas Department of Family and Protective Services); *see also Roquemore*, 60 S.W.3d at 866 (recognizing that a statement which is not the product of custodial interrogation is not subject to the requirements of Family Code § 51.095). In turn, the State reasons that law enforcement must necessarily be somewhere in the vicinity when an interview takes place and "[s]ince the El Paso Jail Magistrates Office does not have a designated Juvenile Processing Office," they have implemented a procedure

24

of conducting interviews with juveniles on the street with law enforcement officers stationed at a distance close enough to ensure public safety but far enough away to ensure that "the intended safeguards [of the Code] are enforced." The gist of the State's argument is that Judge Priddy had no choice but to conduct the interview with F.M.V. in the manner that she did.

As a preliminary matter, we find no requirement that the magistrate must review the juvenile's statement in a juvenile processing office. The Code provides that a county's juvenile board "*may* designate an office or a room, which may be located in a police facility or sheriff's offices, as the juvenile processing office for the temporary detention of a child taken into custody under Section 52.01."[24] Tex. Fam. Code Ann. § 52.025(a). And it further provides that a juvenile may only be "detained" in a designated juvenile processing office for certain limited purposes, including for purposes of "the receipt of a statement by the child under Section 51.095(a)(1), (2), (3), or (5)." But the Code does not expressly state that a meeting with the magistrate to review a juvenile's statement may only take place in a designated juvenile processing office. Tex. Fam. Code Ann. § 52.025. The State has not cited any authority that would prohibit a magistrate from conducting an interview with a juvenile in an area that is not a designated juvenile processing office.

Moreover, while the record reflects the State's concern about finding a location within an adult jail facility where a magistrate could meet with a juvenile without exposing him to adult offenders, the Code expressly allows temporarily detaining a juvenile in a designated area of an adult jail facility if the juvenile is separated from the adults; as the Court of Criminal Appeals has

_____

[24] Section 52.01 provides the circumstances under which "[a] child may be taken into custody," such as under the "laws of arrest." *See* Tex. Fam. Code Ann. § 52.01(a).

25

recognized, this separation avoids the possibility that the juvenile might be influenced or victimized by adult offenders. *See Vega v. State*, 84 S.W.3d 613, 618 (Tex. Crim. App. 2002) (en banc) (finding no Code violation where juvenile was temporarily detained in an interrogation room in an adult jail facility, where "[s]he was at all times kept separate from adult offenders") (citing Tex. Fam. Code Ann. § 51.12 (f) ("A child detained in a building that contains a jail, lockup, or other place of secure confinement, including an alcohol or other drug treatment facility, shall be separated by sight and sound from adults detained in the same building.")). Various courtrooms and offices in the jail facility arguably could have provided such separation, but no one provided an explanation as to why one of those areas was not utilized to conduct F.M.V.'s interview.

By no means do we suggest that there is only one way to promote the safeguards inherent in the Family Code. We heed the State's caution against adopting a rule that requires a "rigid separation of the magistrate, juvenile, and officers." But here, we find no need to adopt a hard-and-fast rule that would limit the locations where an interview may take place or provide an exact description of where a law enforcement officer may be positioned during such an interview, as the record in this case clearly reflects that the that the requirements of the Code were not met under the unique facts of this case.

Specifically, the bodycam footage reveals that throughout F.M.V.'s meeting with the magistrate, there was a police presence in the immediate area, all within F.M.V.'s visual range, including armed officers. At the start of the meeting, the three armed law enforcement officers involved in his case were standing on both sides of the sidewalk in F.M.V.'s view, and other armed police officers were in the immediate vicinity and in fact walked right past F.M.V. and the magistrate, which appears to have distracted F.M.V. during the meeting as he turned his head in

26

their direction. In addition, Bastardo walked directly past Judge Priddy and F.M.V. on two separate occasions during the middle of the meeting to retrieve paperwork.

The fact that the officers were in F.M.V.'s view throughout the proceeding—and at times in his immediate presence—demonstrates an undeniable police presence. The fact that the officers were armed makes this scenario all the more unacceptable under the Code. Even if Judge Priddy had expressed a safety concern, which she denied having, the Code expressly forbids an officer from carrying a firearm when present at the time of a juvenile's meeting with a magistrate to review his statement. Tex. Fam. Code Ann. § 51.095 (1)(B)(i). Accordingly, under the circumstances of this particular case, we cannot say that the meeting took place with no law enforcement officers present as required by the Code.

In its final argument, the State contends that even if we find that the meeting did not take place outside the presence of law enforcement, we should nevertheless find F.M.V.'s statement admissible. In taking this position, the State maintains that F.M.V. did not feel any actual coercion or undue influence during his meeting with Judge Priddy, as reflected by his feeling "comfortable enough" to tell her that he did not tell the detectives he had sent the video of the shooting to his girlfriend. In other words, the State appears to be suggesting that the record must reflect a subjective feeling of coercion or undue influence on the part of the juvenile before his statement should be deemed inadmissible and that this record in fact shows no feeling of coercion or undue

influence.[25] But the State has not cited any authority for that proposition.[26] Nothing in §51.095 leads us to believe there must be a finding that the juvenile subjectively felt coerced or unduly influenced during his meeting with the magistrate to find his statement inadmissible. To the contrary, § 51.095 expressly provides that a written statement is only admissible if it was "signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present." Tex. Fam. Code Ann. § 51.095 (1)(B)(i). Unlike various other provisions in the Family Code governing juvenile proceedings, the Texas Court of Criminal Appeals has emphasized that § 51.095 is an "independent exclusionary statute" that requires the exclusion of a statement not taken in compliance with its requirements. *See Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim. App. 2002); *Torres*, 666 S.W.3d 747 (holding that juvenile's recorded statement was inadmissible where, in violation of §51.095(f) of the Code, magistrate was not permitted to review juvenile's

---

[25] We note that F.M.V.'s willingness to tell Judge Priddy that he did not send the video to his girlfriend could have stemmed from a fear for her safety, as expressed in his earlier text messages to her, rather than from any "comfort" level that he felt during the meeting.

[26] The State cites two cases in which our sister courts have held that it would "elevate form over substance" to find a juvenile's statement inadmissible where the juvenile was not interviewed in a designated juvenile processing office, as required by Family Code§ 52.025, but where the interview took place in an area where there were no adult offenders present at the time, thereby fulfilling the intent of the statute to separate juveniles from adult offenders. *See Williams v. State*, 995 S.W.2d 754, 758 (Tex. App.—San Antonio 1999, no pet.) (recognizing that the purpose of requiring juveniles to be interrogated in specially designated areas is to protect them from exposure to adult offenders and the stigma of criminality, and that the purpose was met where the juvenile was interviewed in an area where no one else was present at the time); *McIntyre v. State*, 619 S.W.3d 311, 328 (Tex. App.—Fort Worth 2021, pet. ref'd) (recognizing that it would elevate form over substance to hold that a juvenile's statement was inadmissible because it was not taken in designated juvenile processing office, where no offenders were present when the statement was taken). But these cases are readily distinguishable; unlike §51.095 of the Code, which is an "independent exclusionary statute," §52.025 does not expressly provide that a statement is inadmissible if it is not taken at a designated juvenile processing center. *See Gonzales v. State*, 67 S.W.3d 910, 913 (Tex. Crim. App. 2002). Instead, in determining whether a statement must be excluded due to a §52.025 violation, the court looks to the Article 38.23(a) exclusionary rule, which has been interpreted to require a causal connection between the illegal conduct and the acquisition of the evidence, *id*. at 912, thereby giving the court more discretion to determine exclusion of evidence stemming from a §52.025 violation as opposed to a §51.095 violation.

recorded statement to determine whether it was made voluntarily); *see also In re J.T.M.*, 441 S.W.3d 455, 464 (Tex. App.—El Paso 2014, no pet.) (holding that juvenile's statement was inadmissible where it was taken without admonitions from magistrate in violation of §51.095).

Because we have found that F.M.V. did not sign his statement outside the presence of law enforcement as required by the Code, we conclude the trial court erred in denying his motion to suppress the statement and by allowing its admission at trial.

## V. WAS F.M.V. HARMED BY THE ADMISSION OF THE STATEMENT?

Although neither party has provided a harm analysis in their briefing, we must nevertheless determine whether the trial court's error in admitting the statement at trial was harmful to F.M.V.'s case. *See Roquemore*, 60 S.W.3d at 867–68 (remanding to the court of appeals to conduct a harm analysis after finding that a juvenile's statement was improperly admitted in violation of the Family Code).

In conducting a harm analysis, our first task is to determine which harm standard to apply. Rule 44.2 provides that [i]f the "appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[27] Tex. R. App. P. 44.2(a). But "[a]ny other error, defect,

---

[27] Because juvenile cases are considered "quasi-criminal," we apply the criminal standard for determining whether F.M.V. was harmed by the erroneous admission of his statement. *See In re D.J.C.*, 312 S.W.3d 704, 711, 722 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing Tex. Fam. Code Ann. § 51.17(a), (c); *In re B.L.D.*, 113 S.W.3d 340, 351 (Tex. 2003) (recognizing that juvenile delinquency cases are "quasi-criminal")); *see also In re U.G.*, 128 S.W.3d 797, 800 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied) (holding that because juvenile delinquency proceedings are "quasi-criminal" in nature, court would apply the criminal standard for conducting a harm analysis).

irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

We find some conflict in the law regarding what standard to apply in determining whether the erroneous admission of a juvenile's statement in violation of the Family Code harmed the juvenile's case. Some of our sister courts have applied the standard for constitutional error, observing that "the improper admission of a statement in response to custodial interrogation implicates the constitutional right against self-incrimination." *See Marsh v. State*, 140 S.W.3d 901, 908 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (finding juvenile's constitutional right against self-incrimination was implicated where law enforcement did not follow proper procedures in notifying juvenile's parents prior to interrogating him as required by the Family Code) (citing *Jeffley*, 38 S.W.3d at 858 (applying constitutional harm analysis where the juvenile made two oral statements without receiving adequate warnings from a magistrate in violation of the Family Code)); *see also In re D.J.C.*, 312 S.W.3d at 721–22 (applying the constitutional standard for harm where the trial court erroneously admitted a juvenile's statement in violation of the Family Code by failing to take the juvenile to a designated juvenile processing center, excluding the juvenile's legal guardian for the interview, and failing to provide the juvenile with adequate warnings prior to the interview).

Other courts have applied the standard for non-constitutional error in determining whether a juvenile was harmed by the erroneous admission of a statement obtained in violation of the Family Code's requirements, where the violation only amounted to a statutory violation, rather than one of a constitutional magnitude. *See Roquemore*, 95 S.W.3d 315, at 316 (applying Rule 44.2(b) in determining whether juvenile was harmed by the trial court's erroneous admission of

30

his statement that was obtained in violation of the Family Code's requirement that a juvenile be taken to a designated juvenile processing center); *see also Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022) (distinguishing between situations in which a statement was admitted in violation of a defendant's constitutional rights and situations in which it was "found to be admitted only in violation of a statute [where] the harm analysis for non-constitutional errors applies").

In the case before us, we need not decide which standard should be applied as we find that admitting the statement was harmful even under the lesser Rule 44.2(b) standard for non-constitutional error. *In re C. R.*, 995 S.W.2d at 786–87 (court declined to whether the violation of Family Code § 52.02(b) constituted constitutional error because, even assuming the error was non-constitutional, court found admission of the statement affected the juvenile's substantial rights and thus could not be deemed harmless).

Under the harm standard for non-constitutional error, an error is reversible only when it has "a substantial and injurious effect or influence in determine the jury's verdict." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id*. "In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Id.* Here, all four factors point to a finding of harm.

In assessing the character of an error in wrongfully admitting a confession, the Court of Criminal Appeals has recognized that the erroneous admission of a defendant's statement in which

he implicates himself in the commission of the charged offense "is unlike any other evidence that can be admitted against the defendant." *McCarthy v. State*, 65 S.W.3d 47, 55–56 (Tex. Crim. App. 2001). The Court of Criminal Appeals quoted the United States Supreme Court's opinion in *Fulminante* on this point:

> [A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*Id.* at 56 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

F.M.V.'s statement implicating himself in the offense not only would have had a profound impact on the jury, but it was the only direct evidence presented by the State to show he had an active role in the offense. In closing argument, the prosecutor repeatedly emphasized F.M.V.'s statement, arguing it was clear evidence of his role in the offense. *Id.* at 52–55 (finding it significant that the prosecutor repeatedly emphasized erroneously admitted statement throughout the defendant's trial); *In re M.G.*, No. 10-09-00037-CV, 2010 WL 3292711, at *6 (Tex. App.—Waco Aug. 11, 2010, no pet.) (mem. op., not designated for publication) (holding that State's emphasis on juvenile's erroneously admitted videotaped confession during closing argument was a significant factor in finding harm).

Accordingly, after viewing the record as a whole, we do not have fair assurance that the error did not influence the jury or that its effect was but slight. Instead, we conclude that the erroneous admission of F.M.V.'s statement had a substantial and injurious effect on the jury's deliberations. *See In re C. R.*, 995 S.W.2d at 786–87 (after reviewing the record and considering the "potentially dramatic effect of a written confession on the decision-making process of a jury,"

court did not have fair assurance that the erroneous admission of the confession "did not influence the jury, or had but a slight effect").

## VI.  Conclusion

We reverse the trial court's judgment and remand for a new trial.

LISA J. SOTO, Justice

July 29, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.